[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is an appeal from an October 10, 1989 final decision of the Director of the Department of Environmental Management (DEM) denying the application of Wings Financial Marketing Corporation (Wings) to alter certain freshwater wetlands (wetlands) located in the Town of East Greenwich, Rhode Island and identified in the record as Assessor's plat 19-0, lots 9 and 10 (the site).
The application was originally filed by Robert Catanzaro in 1987. Mr. Catanzaro had filed an application with DEM for a determination of a wetlands edge located on his property. Pursuant to R.I.G.L. 1956 § 2-1-18 (1987 Reenactment) et seq.
(The Wetlands Act), and the "Rules and Regulations Governing Enforcement of the Fresh Water Wetlands Act", (The Wetlands Regulations), he proposed to construct a bridge and roadway over the wetlands located at the site in order to develop the rest of the site into a residential area of 23 single family homes. Without that construction there would be no access to the proposed development. DEM determined that the proposed construction would significantly alter the subject wetlands. Therefore, Mr. Catanzaro filed a formal application to alter wetlands. Subsequently, he sold the property to Wings which pursued the application. DEM denied the formal application. In accordance with the statute and the rules, Wings appealed this denial. A hearing on the appeal was scheduled for January 20, 1989. The hearing was postponed by agreement of both parties to allow Wings to file revised plans with DEM.[1]
Several public hearings were held between February 22, 1989 and April 25, 1989.[2] On October 13, 1989, the hearing officer upheld the denial of the permit. Wings then appealed to the Superior Court.
The jurisdiction of this Court to review this appeal is governed by R.I.G.L. 1956 (1984 Reenactment). Section 42-35-15(g) provides:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Under § 45-35-15(g), this Court may reverse or modify an administrative decision if the decision is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record. Costa v. Registrar of MotorVehicles, 543 A.2d 1307, 1309 (R.I. 1988). This Court may not substitute its judgment for that of the agency, but will merely review the findings of fact to see whether those findings support the agency's decision. St. Pius X Parish Corp. v. Murray,557 A.2d 1214, 1218 (R.I. 1989).
Wings contends, among other things, that the hearing officer erred in designating the area in question a "valuable" wetland because there is no factual basis to sustain the determination that the wetland was valuable. Therefore, according to Wings, DEM's final order and decision were clearly erroneous.
The policy for denial of approval of a wetlands application is found in section 5.03 of the DEM Rules and Regulations Governing the Enforcement of the Freshwater Wetlands Act (1981). In pertinent part, § 5.05 provides as follows:
 (c) Approval of a proposed alteration to a wetland will be denied by the Director, if, in his opinion, such alteration will cause random, unnecessary and/or undesirable destruction of fresh water wetlands including, but not limited to:
 (7) Reduction of the value of any "valuable" wetland (see Section 7.06).
Section 7.06(b) of the DEM Rules and Regulations describes "valuable" wetlands as follows:
 (b) Valuable Wetland — The term "Valuable Wetland" as used herein shall mean any wetland providing valuable wildlife habitat or valuable recreational environment;
 "Valuable Wildlife habitat" shall refer to:
 (1) those marshes, swamps and bogs which are characterized by "high" diversity and productions of wildlife, according to the aforementioned "Wetland — Wildlife Evaluation Model", and
 (2) those rivers and ponds classified by regulation as Category A, B, or C by the DEM Division of Fish and Wildlife.
 Valuable Recreational Environment shall mean a relatively natural or undeveloped area which, in its natural state, is capable of supporting recreation by the general public. Typical recreational activities would include, but not be limited to: education, hunting, fishing, trapping, biking, canoeing, ice skating, skiing, bird watching and nature photography. (Emphasis added.)
The hearing officer determined that the wetlands were a valuable recreational environment as defined in § 7.06(b). He specifically found:
 That the subject wetland is in a relatively natural and undeveloped area, which in its natural state is capable of supporting recreation by the general public, which provides a valuable recreational environment and is thereby considered a "valuable" wetland.
 That the proposed project will adversely affect the wildlife habitat and the recreational environment and will reduce the value of a "valuable" wetland.
 That the proposed project would thwart the policies expressed in Rhode Island General Laws Section 2-1-19 and is inconsistent with the functions enumerated in Section 2-1-18.
An examination of the whole record supports these findings. DEM presented several expert witnesses, including Brian Tefft who conducted field work at this site and concluded that this wetland was capable of supporting recreational activity. He visited the site six times. Tefft stated that he observed various animals and vegetation, and that the area is currently relatively natural and undeveloped. Tefft testified that recreational activities would be adversely affected by a bridge and roadway. Based upon his observations, Tefft recommended denial of Wings permit.
In support of its position, Wings argues that the wetlands are not "valuable" because the wetlands did not achieve a certain minimum score under the modified Golet method of determining whether a wetlands is a valuable wildlife habitat. The modified Golet method is an objective system of ranking wetlands relative to each other. It is useful in determining whether a wetlands is a valuable wildlife habitat.
Wings reliance on the wetlands' Golet score is misplaced because the method does not measure the recreational value of the wetlands. Based on the evidence before him, the hearing officer concluded that the wetlands was capable of supporting a recreational environment as defined by the regulations. Wings' argument that no recreational activities have been observed at the site is of no consequence. That is because under the regulations, a wetlands is "valuable" if it is capable of supporting a recreational environment. The hearing officer's conclusion in this regard was in accordance with the evidence and the applicable standard.
Wings also argues that the hearing officer erred in determining that the proposed alteration to the wetlands would result in an unnecessary and undesirable destruction of a wetland. However, the record does support the hearing officer's determination. After examining the evidence, the hearing officer made the following findings, among others:
 1. a stream at the southerly edge of the wetlands flows south toward Scrabbletown Brook which feeds into the Hunt River. Therefore, the wetlands are associated with the watershed of the Hunt-Annaquatucket-Pettaguamscutt ("HAP") Aquifer.
 2. a hydrologic connection exists between the subject wetlands and the HAP aquifer.
 3. the wetlands provide a recharge source for the groundwater reservoir which provides East Greenwich with drinking water.
 4. East Greenwich relies on the HAP aquifer as its sole (over 50%) source of drinking water.
 5. The proposed development will permanently reduce the size of the wetland by approximately 2/3 acre which will reduce the ability of the wetlands to recharge a ground water aquifer.
 6. The alteration will adversely affect water quality through sedimentations and various pollutants.
Based on these findings and the finding that the wetlands was "valuable", the hearing officer concluded that the proposed alteration would cause an undesirable disturbance of a fresh water wetlands.[3] This conclusion is also in accordance with the evidence and the applicable standard as set forth in the regulations and the statute.
Lastly, Wings argues that DEM's selection of Mr. Joseph Baffoni as a hearing officer in this case was procedurally defective. Wings claims that Mr. Baffoni, by virtue of his being a paid hearing officer, is affiliated with DEM and therefore was hired in direct conflict with the provisions of a court order requiring DEM to appoint a hearing officer "not affiliated in any manner" with DEM. This argument lacks merit.
Mr. Baffoni was and is a private attorney appointed by the DEM director pursuant to Wetlands Regulation § 11.03(c) and (d). Neither these regulations nor the provisions of the court order were violated with the Director's choice of Mr. Baffoni, who is not a permanent employee of DEM. In addition, the record reveals no bias, prejudice or unfairness towards the applicant Wings by this hearing officer.
For the above-stated reasons, this Court affirms the October 13, 1989 final order of the Director of DEM and directs counsel to prepare and submit an appropriate order for entry.
[1] The revised plans proposed to locate the access road in the narrowest portion of the site wetland. The DEM found that even these revised plans would require destruction of wetlands.
[2] Public hearings were conducted on February 22, 1989, March 9, 1989, March 23, 1989, March 29, 1989, April 6, 1989, April 11, 1989, April 20, 1989 and April 25, 1989.
[3] Wing's argument that there is no access to the site other than as provided in the proposed alteration is of no consequence, that is because the decision to deny the proposed alteration is sound whether or not there is alternate access to the site.